**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**EMMERICH NEWSPAPERS, INC.**                                                    **PLAINTIFF**

**VS.**                                                    **CAUSE NO. 3:23-CV-118-HTW-LGI**

**SMARTNEWS, INC., SMARTNEWS**
**INTERNATIONAL, INC., KEN SUZUKI and**
**KAISEI HAMAMOTO,**                                                    **DEFENDANTS**

**and**

**SMARTNEWS INTERNATIONAL, INC.**                                                    **COUNTER-PLAINTIFF**

**VS.**

**EMMERICH NEWSPAPERS, INC.**                                                    **COUNTER-DEFENDANT**


**DEFENDANTS/COUNTER-PLAINTIFF'S MEMORANDUM IN SUPPORT**
**OF MOTION TO DISMISS FOR LACK OF STANDING UNDER**
**FED. R. CIV. P. 12(B)(1), AND IN THE ALTERNATIVE TO REFER**
**TO THE REGISTER OF COPYRIGHTS UNDER 17 U.S.C. § 411(B)(2)**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................2

    A.    Plaintiff improperly secured registrations for works it did not own. .......................3

    B.    Plaintiff ignored clear legal requirements and guidance from the Copyright Office on copyright registration applications. .........................................4

        1.    The Copyright Office repeatedly explained authorship and transfer rules and concepts to Plaintiff's president. ....................................5

        2.    Plaintiff continued to register works it took from other sources. ...............7

    C.    Plaintiff solicited invalid "Contributor/Freelance" agreements..............................8

    D.    After receiving notice of the ownership deficiencies, Plaintiff crafted an ineffective "Instrument of Conveyance" more than a year after filing its case....................................................................................................................10

III.  ARGUMENT .........................................................................................................11

    A.    Emmerich Newspapers had no standing to bring this lawsuit. ..............................12

        1.    Plaintiff lacks standing to sue for works from outside sources. ...............13

        2.    The "Contributor/Freelance" agreements did not transfer ownership.........................................................................................14

        3.    Plaintiff lacks standing for works created by its subsidiaries. ..................17

    B.    If the Court does not find that Plaintiff lacks standing, it should refer Plaintiff's defective registrations to the Register of Copyrights............................21

IV.   CONCLUSION......................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Big E. Ent., Inc. v. Zomba Enters., Inc*,
  453 F. Supp. 2d 788 (S.D.N.Y. 2006), *aff'd*, 259 F. App'x 413 (2d Cir. 2008)...............17, 18

*Cibolo Waste, Inc. v. City of San Antonio*,
  718 F.3d 469 (5th Cir. 2013) ................................................................................................11

*Compaq Computer Corp. v. Ergonome Inc.*,
  210 F. Supp. 2d 839 (S.D. Tex. 2001) .................................................................................15

*Cornerstone Christian Schs. v. Univ. Interscholastic League*,
  563 F.3d 127 (5th Cir. 2009) ................................................................................................11

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008)...............................................................................................................11

*Disenos Artisticos E Industriales, S.A. v. Costco Wholesale Corp.*,
  97 F.3d 377 (9th Cir. 1996) ..................................................................................................17

*Ducky Ltd. v. Iviliia Millionic IT Sp.*
  *z o.o.*, No. 3:24-cv-02268-PHK, 2025 WL 1580870 (N.D. Cal. June 4, 2025)...........21, 22, 23

*Eclipse Sportswire v. The Sports Mall, LLC*,
  No. 8:22-cv-1433-KKM-NHA, 2024 WL 1549643 (M.D. Fla. Mar. 14, 2024) ...................16

*Emerald City Mgmt., LLC v. Kahn*,
  No. 4:14-cv-358, 2016 WL 98751 (E.D. Tex. Jan. 8, 2016) .................................................19

*Emmerich Newspapers, Inc. v. Particle Media Inc.*,
  No. 3:23-cv-26-TSL-MTP, 2025 WL 2906046 (S.D. Miss. Sept. 18, 2025) .........................13

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*,
  No. 3:23-cv-391-TSL-RPM, 2025 WL 2146609 (S.D. Miss. July 29, 2025) ........................13

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*,
  No. 3:23-cv-00026-TSL-MTP (S.D. Miss. Feb. 22, 2024), ECF No. 64 ................................2

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*,
  No. 3:23-cv-00026-TSL-MTP (S.D. Miss.)............................................................................4

*Est. of Kauffmann v. Rochester Inst. of Tech.*,
  932 F.3d 74 (2d Cir. 2019).....................................................................................................15

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)................................................................................12, 13, 14

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*,
586 U.S. 296 (2019)....................................................................................................13

*Gladwell Gov't Servs., Inc. v. Cnty. of Marin*,
265 F. App'x 624 (9th Cir. 2008) ............................................................................15

*Jane Envy, LLC v. Infinite Classic, Inc.*,
No. SA:14-CV-065-DAE, 2016 WL 797612 (W.D. Tex. Feb. 26, 2016)..............12

*Keene Corp. v. United States*,
508 U.S. 200 (1993)........................................................................................11, 12, 18

*Lieb v. Korangy Publ'g, Inc.*,
No. CV 15-0040 (AYS), 2022 WL 1124850 (E.D.N.Y. Apr. 14, 2022),
*appeal dismissed*, No. 22-1084, 2023 WL 3439481 (2d Cir. Mar. 2, 2023) ....................14, 23

*Looney Ricks Kiss Architects, Inc. v. Bryan*,
No. 07-572, 2010 WL 4068885 (W.D. La. Oct. 14, 2010)....................................15

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)........................................................................................................11

*Magicon, LLC v. Weatherford Int'l, Inc.*,
No. 4:08-cv-03636, 2009 WL 7868862 (S.D. Tex. Aug. 14, 2009)......................15

*Minden Pictures Inc. v. Ammoland, Inc.*,
No. 20-2276 (GC) (TJB), 2023 WL 4288332 (D.N.J. June 30, 2023) ..............18, 19

*Mollan v. Torrance*,
22 U.S. (9 Wheat.) 537 (1824)..................................................................................12

*Nason Homes, LLC v. Singletary Constr., LLC*,
No. 3:14-cv-1656, 2016 WL 11985340 (M.D. Tenn. Mar. 23, 2016)....................23

*Neman Bros. & Assocs., Inc. v. Interfocus, Inc.*,
No. 2:20-cv-11181-CAS-JPRx, 2023 WL 115558 (C.D. Cal. Jan. 4, 2023)....................22, 23

*Norma Ribbon & Trimming, Inc. v. Little*,
51 F.3d 45 (5th Cir. 1995) ........................................................................................12

*Olem Shoe Corp. v. Washington Shoe Co.*,
No. 09-23494-CIV, 2010 WL 3505100 (S.D. Fla. Sept. 3, 2010)..........................22

iii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Patterson v. Rawlings*,
    287 F. Supp. 3d 632 (N.D. Tex. 2018) ....................................................12, 13, 14

*R. Ready Prods., Inc. v. Cantrell*,
    85 F. Supp. 2d 672 (S.D. Tex. 2000) ...................................................................16

*R.R. Donnelley & Sons Co. v. Marino*,
    505 F. Supp. 3d 194 (W.D.N.Y. 2020)................................................................17

*Righthaven LLC v. Hoehn*,
    716 F.3d 1166 (9th Cir. 2013) .......................................................................16, 17

*Ronaldo Designer Jewelry, Inc. v. Cox*,
    No. 1:17-CV-2-DMB-DAS, 2019 WL 3978414 (N.D. Miss. Aug. 22, 2019) ......................23

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
    969 F.2d 410 (7th Cir. 1992) ...............................................................................15

*Sensory Path Inc. v. Fit & Fun Playscapes LLC*,
    No. 3:19CV219-GHD-RP, 2022 WL 17073159 (N.D. Miss. Nov. 17, 2022) ........................18

*Triple Tee Golf, Inc. v. Nike, Inc.*,
    No. 4:04-CV-302-A, 2007 WL 4260489 (N.D. Tex. Aug. 10, 2007), *aff'd*, 281 F.
    App'x 368 (5th Cir. 2008) ...................................................................................18

*Utopia Provider Sys., Inc. v. Pro–Med Clinical Sys., L.L.C.*,
    596 F.3d 1313 (11th Cir. 2010) .....................................................................12, 13

*Viral DRM, LLC v. Frank Kent Country, LLC*,
    No. 3:23-CV-0250-D, 2023 WL 5284844 (N.D. Tex. Aug. 16, 2023) ..................................12

*Wood v. B L Bldg. Co.*,
    No. H-03-713, 2004 WL 5866352 (S.D. Tex. June 22, 2004)................................................18

**STATUTES AND RULES**

17 U.S.C. § 101 ...............................................................................................14, 15, 16

17 U.S.C. § 201 ...............................................................................................12, 17, 18

17 U.S.C. § 409(5) ......................................................................................................14

17 U.S.C. § 410(c) ......................................................................................................12

17 U.S.C. § 411(b) .............................................................................................. *passim*

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

17 U.S.C. § 501(b) ........................................................................................12

Digital Millennium Copyright Act, 17 U.S.C. § 1202 ....................................13

Federal Rule of Civil Procedure 12(b)(1) ......................................1, 2, 13, 24

**OTHER AUTHORITIES**

Deborah Cole, *Clarkdale Press Register Changes with times*, The Clarksdale Press
    Register (April 1, 2009) ...........................................................................11

Melville B. Nimmer & David Nimmer, 3 Nimmer on Copyright (2024) ........12

Report of the Register of Copyrights: Fiscal Year Ending
    September 30, 2009 (2009) .......................................................................21

Staff Report, *Mississippi Institute of Arts and Letters Honors UM Alumni,*
    *Faculty*, Red Hills MS News (June 9, 2022) .............................................6

Staff Report, *Mississippi Institute of Arts and Letters Honors UM Alumni,*
    *Faculty*, University of Mississippi (June 9, 2022) ....................................6

U.S. Copyright Office, Compendium of U.S. Copyright Office Practices
    (3d ed. 2021) ...............................................................................6, 14, 22

COMES NOW Defendant/Counter-Plaintiff SmartNews International, Inc., and Defendants SmartNews, Inc., Ken Suzuki, and Kaisei Hamamoto (collectively "SmartNews" or "Defendants"), by and through their counsel, and files this memorandum in support of its motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1), and in the alternative for referral to the Register of Copyrights under 17 U.S.C. § 411(b)(2) [Dkt. 105], and in support thereof states as follows:

## I.     INTRODUCTION

Emmerich Newspapers, Inc. ("Emmerich" or "Plaintiff") filed this case in 2023, asserting copyright claims against SmartNews over thousands of works Emmerich does not own.  An initial review of the asserted works raised serious questions about Emmerich's copyright registrations, which Emmerich did not cure when it filed its substitute first amended complaint ("FAC").  Although discovery to date has been limited, the record shows that Emmerich does not have legal ownership of *any* of the copyrights it has asserted.  Lacking copyright ownership, Emmerich does not have standing to sue.  For that reason, the Court should dismiss the FAC with prejudice.

Emmerich is a holding company and does not appear to publish any newspaper *itself*.  Instead, it owns *other companies*—subsidiaries—that publish newspapers.  Emmerich obtained copyright registrations for articles its subsidiaries published by falsely telling the Copyright Office that it owns those works, even though Emmerich had no agreements transferring ownership from the subsidiaries to Emmerich.  It is black-letter copyright law that a parent company does not own its subsidiaries' copyrighted works as a result of the parent-subsidiary relationship.  Furthermore, Emmerich registered the asserted copyrights by falsely claiming ownership over works published and owned by third parties who did not transfer ownership to Emmerich.  Neither Emmerich nor any of its subsidiary newspapers authored these works, which include funeral-home or family obituaries, press releases, and paid political advertisements.  These issues persist in the FAC.

1

Because Emmerich does not own the copyrights or valid registrations for any of the works it has put at issue in this case, it lacks standing to bring claims over them. The Court should therefore dismiss this case under Federal Rule of Civil Procedure 12(b)(1). Alternatively, the Court should request the Register of Copyrights ("the Register") to advise the Court whether the inaccurate information in Plaintiff's asserted copyright registration would have caused the Register to refuse registration under 17 U.S.C. § 411(b)(2).

## II.    FACTUAL BACKGROUND

Emmerich is a private company headquartered in Jackson, Mississippi. FAC [Dkt. 94] ¶¶ 13, 18; Declaration of Tyler Newby ("Newby Decl.") ¶ 4, Ex. 2 (representative example of "Emmerich Newspapers – General Information" pages). Emmerich owns 22 subsidiaries across Mississippi, Louisiana, and Arkansas that operate local newspapers. FAC ¶ 21; Newby Decl. ¶¶ 4-5, Ex. 2 (representative example of "Emmerich Newspapers – General Information" pages), Ex. 3 (Emmerich's 2021 tax return) at PP009484-86. Emmerich filed this case based on copyrights it claimed to own when it registered them between April 7, 2022, and January 19, 2023. Original Complaint ("Compl.") [Dkt. 1]; Newby Decl. ¶¶ 23-35, Exs. 19-29 (copyright registrations). On July 24, 2025, Emmerich filed the FAC with an updated list of works it asserts are at issue. FAC [Dkt. 94]; FAC Ex. F [Dkt. 94-6]; Newby Decl. ¶¶ 2-3, Ex. 1. The FAC removed several of the obituaries Emmerich did not author that were on its list of allegedly infringed works in the original complaint, but approximately 40 obituaries remain. *See* FAC [Dkt. 94]; FAC Ex. F [Dkt. 94-6].[1] As discussed further, Emmerich did not own any of the copyrights here before filing this lawsuit.

---

[1] Similarly, in its litigation with Particle Media, Emmerich "relinquished its claim to copyright ownership of articles falling in every category of problematic articles listed by Article"—totaling 3,747 articles. *See* Pl.'s Reply to Def.'s Resp. to Mot. for Partial Sum. J. on the Issue of Liability for Copyright Infringement, *Emmerich Newspapers, Inc. v. Particle Media, Inc.*, No. 3:23-cv-00026-TSL-MTP, at 8 (S.D. Miss. Feb. 22, 2024), ECF No. 64.

**A.      Plaintiff improperly secured registrations for works it did not own.**

Emmerich has falsely claimed copyright of four different categories of works.

**Category 1: Preexisting Works from Outside Sources:** These works include (though are not limited to), 40 family obituaries from funeral home websites, approximately 35 press releases from non-parties, nearly a dozen public notices, and dozens of other works that Plaintiff's subsidiaries likely collected from other sources, including state and federal agencies. *See* Newby Decl. ¶¶ 6-14, Exs. 4-12 (Category 1 examples).

**Category 2: Works from or Submitted by Outside Sources with No Documentation:** These works include hundreds of works by sources who are neither employees of Emmerich's subsidiaries nor have any license or agreement with Emmerich, and were likely submitted to Emmerich's subsidiaries by outside sources, including school honor rolls, police reports, church bulletins, paid political advertisements, wedding announcements, and articles from other sources. *See id.* ¶¶ 15-17, Exs. 13-14 (Category 2 examples).

**Category 3: Works Contributed by Outside Sources with No Valid Ownership:** Emmerich executed so-called "Contributor/Freelance" agreements with about 78 sources. Newby Decl. ¶ 18, Ex. 15 ("Contributor/Freelance" agreements). These "agreements," however, did not specify any particular work but rather purport to give Emmerich the right to publish "contributed" or "submitted" content. *Id.* Nearly 20 of the agreements were with full or part-time employees of the subsidiaries who lacked the power to affect the ownership of works their employers owned, while the remainder were with outside contributors. *Id.* As discussed below, these documents did not grant Emmerich valid copyright ownership over any of the works contributed by any of the signatories. *See id.* ¶ 19, Ex. 16 (Category 3 example).

**Category 4: Works Authored by Emmerich's Subsidiaries:** Emmerich's subsidiaries and their employees created or obtained the content, printed, and published the newspapers. *Id.*

¶¶ 4-5, Ex. 2 ("Emmerich Newspapers – General Information" page explaining that Emmerich is "the parent company of all ***the subsidiaries that produce content*** as detailed on these pages" (emphasis added)), Ex. 3 (Emmerich's 2021 tax return) at PP009511-13 (subsidiaries' claimed deductions for "Newspaper printing" but none for Plaintiff); Ex. 3 (Emmerich's 2021 tax return) at PP009487-89, lines 12-13 (salaries and wages paid by subsidiaries).  At the time Emmerich registered those copyrights, it had no written agreements with the subsidiaries assigning copyrights in those works to Emmerich.  As discussed below, Emmerich therefore lacked rights to the works created by its subsidiaries' employees.  *See id*. ¶¶ 20-22, Exs. 17-18 (Category 4 examples); *id*. ¶¶ 23-35, Exs. 19-29 (copyright registrations).

Beginning in April 2022, Emmerich began applying for individual registrations for thousands of these works, in an evident attempt to gin up a claim for many millions of dollars' worth of statutory damages, and to prepare litigation campaigns against Defendants and Particle Media.[2]  Although Emmerich was incorporated more than 50 years ago, and had registered hundreds of newspaper issues as part of group registrations, it had previously registered copyrights for only 9 individual articles.  *See id*. ¶ 36, Ex. 30.

### B.     Plaintiff ignored clear legal requirements and guidance from the Copyright Office on copyright registration applications.

As Emmerich churned out thousands of individual copyright applications, it corresponded with the Copyright Office, which repeatedly told Emmerich that it needed to include the correct author, identify any transfer of ownership, and disclaim ownership over works and text from other sources.  Emmerich ignored those requirements.

---

[2] FAC. Ex. F [Dkt. 94-6]; *see generally Emmerich Newspapers, Inc. v. Particle Media, Inc.*, No 3:23-cv-00026-TSL-MTP (S.D. Miss.).

1.    **The Copyright Office repeatedly explained authorship and transfer rules and concepts to Plaintiff's president.**

In April 2022, a Copyright Office registration representative emailed Emmerich's president about an editorial it had submitted for registration, noting that the "author and claimant on the registration application are different.  However, there is no transfer statement given."  *Id*. ¶ 37, Ex. 31 (Copyright Office correspondence) at PP006379.   The representative further explained: "Originally, copyright belongs to the author.  Ownership or co-ownership of the copyright may be transferred to another person or organization by a written agreement or by an operation of law.  If a claimant listed on the registration record is not an author of the work, the record must contain a statement of how the claimant acquired the right to claim copyright."  *Id.* Emmerich's president responded that "[t]he author and the claimant is the same: Emmerich Newspapers, Inc.  It is a work for hire.  I believe the confusion was caused by leaving out the 'Inc.' on the author page."  *Id.*[3]

Then, on June 27, 2022, a representative from the Copyright Office contacted Emmerich's president about a list of 911 calls it was attempting to register.  *Id.* ¶ 38, Ex. 32 at PP006390, PP006393, PP006399.  When Emmerich's president claimed that the 911 calls were compiled by his staff, the representative explained that "when examining a work for original authorship, the U.S. Copyright Office does not consider the amount of time, effort, or expense required to create the work.  These issues have no bearing on whether a work possesses the creative authorship required by the Copyright Act and the Constitution."  *Id.* at PP006398.  Eventually, Emmerich's

---

[3] As it turns out, Plaintiff did not create this article, rather a writer employed by one of the subsidiaries with whom Plaintiff sought a "Contributor/Freelance Agreement" did.  *See* Newby Decl. ¶¶ 18, 21, Ex. 15 ("Contributor/Freelance" Agreements) at PP000463, Ex. 17 (Lady Cougars rack up three wins including 2 in district).  This example is illustrative of works created by Plaintiff's subsidiaries' employees, which Plaintiff did not have any valid rights to (i.e., Category 4 works).

president claimed it was a non-exhaustive list, and the Copyright Office allowed registration of the 911 calls as a "compilation of data." *Id*. Three days later, a different representative wrote to Emmerich's president about a list of arrests Emmerich was trying to register, explaining that there was "insufficient textual authorship … to support a claim in 'text'" and allowing Emmerich to register the list of arrests as a compilation. *Id*. ¶ 39, Ex. 33 at PP006406. Notwithstanding these exchanges, over the following months, Emmerich continued to claim copyrights for texts of an arrest docket and jail dockets. *See e.g*, FAC Ex. F, Rows 104-09; 808-09.

A few days later, a third Copyright Office representative contacted Emmerich about its application to register a University of Mississippi press release that previously appeared on the university's website. Newby Decl. ¶ 40, Ex. 34 (Copyright Office correspondence) at PP006408. The only differences between the press release and what Plaintiff registered was the substitution of "Ole Miss" for "UM" in two places and the addition of the word "prestigious" before "awards" in the last sentence.[4] The representative wrote: "Your application indicates that Emmerich Newspapers, Inc. is the author and claimant of the text, however I am unable to verify this in my examination of the work you submitted." *Id*. at PP006408. Plaintiff's president responded falsely, "Yes. Emmerich Newspapers is the author and claimant of this work." *Id*. at PP006407. Based on this response, the Copyright Office allowed the registration.[5] *Id*.

---

[4] *Compare* Staff Report, *Mississippi Institute of Arts and Letters Honors UM Alumni, Faculty*, University of Mississippi (June 9, 2022), https://libarts.olemiss.edu/mississippi-institute-of-arts-and-letters-honors-um-alumni-faculty/, *with* Staff Report, *Mississippi Institute of Arts and Letters Honors UM Alumni, Faculty*, Red Hills MS News (June 9, 2022), https://www.redhillsmsnews.com/schools-state/mississippi-institute-arts-and-letters-honors-um-alumni-faculty. Newby Decl. ¶ 13, Ex. 11.

[5] "The U.S. Copyright Office generally will accept the facts stated in the application and other registration materials, unless they are implausible or conflict with information in the registration materials, the Office's records, or other sources of information that are known by the Office or the general public." U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 309.2 (3d ed. 2021) ("Compendium Third").

## 2. Plaintiff continued to register works it took from other sources.

Despite these exchanges, Plaintiff continued to register press releases authored and owned by outside sources. These included a press release titled "Noxapater Attendance Center students improve English ACT® scores after reviewing with Jumpstart Test Prep," which Emmerich registered on August 24, 2022, and asserts in this action. FAC Ex. F, Row 1151. However, this press release was published by Jumpstart Test Prep.[6] *Id*.; Newby Decl. ¶ 14, Ex. 12. On September 26, 2022, Emmerich again tried to register a university press release. A representative wrote that the application included "text from other sources [which] should typically be excluded from your claim." *Id*. ¶ 41, Ex. 35 at PP006337; *see also id*. ¶ 42, Ex. 36. This time, the representative warned Emmerich's president that "***any person who knowingly makes a false representation of a material fact in an application for copyright registration … or in any written statement filed in connection with the application, shall be fined not more than $2,500***." *Id*. ¶ 41, Ex. 35 at PP006337 (emphasis added). Plaintiff's president responded that the registration was "in error" and that the representative should "dismiss it." *Id*. at PP006336.

Even after months of these exchanges with the Copyright Office, Emmerich continued to try to register works from other sources, including "Santa Letters" written by children. In January 2023, the Copyright Office explained that the letters "appear to be written by elementary age children, not by employees of Emmerich Newspapers Inc or by other parties hired or specially commissioned to create works made for hire. If that is accurate, then Emmerich cannot register a claim in this text." *Id*. ¶ 43, Ex. 37 at PP006535. Emmerich's president then submitted the children's letters as a "compilation." *Id*. In total, Emmerich's president had more than 100 such

---

[6] FAC Ex. F Row 1151. The only change from the original press release was the removal of the "40% Improved prior best actual ACT® English score by an average 3.00 points" subtitle and removal of the "MS" state abbreviation from the press release dateline. Newby Decl. ¶ 14, Ex. 12.

instructional exchanges with the Copyright Office over 16 months.  *See* Newby Decl. ¶ 37.  These examples illuminate Emmerich's intentional attempts to register copyrights in works it did not author or own through assignment or work-for-hire relationships.

###    C.    Plaintiff solicited invalid "Contributor/Freelance" agreements.

Emmerich also registered and asserted copyrights in materials that third parties submitted to its subsidiaries' newspapers for publication without having been commissioned or specially ordered pursuant to a written agreement.  To include those articles in this lawsuit, Plaintiff asked some of those outside sources to sign *post-publication* "Contributor/Freelance" agreements.  From about June 2022 to June 2023, Plaintiff engaged in a campaign where it (or an employee of one of the subsidiaries) requested that many outside sources of content (largely previously submitted) sign such "Contributor/Freelance" agreements.[7]  Plaintiff produced 78 of these agreements either in the form of a standalone document or as an email.  *See, e.g.*, Newby Decl. ¶ 18; Ex. 15 ("Contributor/Freelance" agreements) at PP000386-472.  Of the 78 supposed "agreements," nearly 20 are with full- or part-time employees of the subsidiaries, while the remainder are with unaffiliated sources.  *Id*.  The standalone documents contain the following language:

> This is an agreement between print and online publisher Emmerich Newspapers, Inc. (the commissioning party) and contributors and freelancers who submit columns and articles (the creators of the work).
>
> This agreement gives Emmerich Newspapers the right to publish and copyright all contributed content as a work made for hire.

*See, e.g.*, *id*. at PP000402; PP000433.  Most also stated: "Please note:  All contributors and freelancers are given permission to publish their work on any other website, publication or forum that they so choose."  *See, e.g.*, *id*. at PP000406; PP000408; PP000409; PP00440.

---

[7] As discussed, many of these purported agreements are undated, so Defendants cannot know exactly when they purportedly became effective.  But from the context of the agreements that Plaintiff produced, it appears that most were signed between June 7, 2022, and June 8, 2023. Newby Decl. ¶ 18, Ex. 15.

The correspondence with the contributors requesting permission to copyright their submitted content contained substantially similar language to the following:

Dear [contributor],

Emmerich Newspapers, Inc. has a policy of copyrighting all its content to keep it from being scraped and stolen over the Internet. In addition, our libel insurance policy requires us to get "work for hire" agreements for all contributors (even if the contribution is free.) We are asking you for your permission to publish and copyright your submitted content. ***This does not take away any of your rights to give anyone else permission to use your content. You are free to use your work anywhere else if you give your permission.*** All you need to do is respond to this email, by stating "I agree" and typing your name.

*See, e.g.*, *id*. at PP000417; PP000423-25; PP000431; PP000452 (emphasis added).

Regardless of form, these so-called agreements omitted crucial details—not least of which was *the specific works* for which Plaintiff attempted to gain the non-exclusive right to publish. *Id*. A number of the supposed agreements did not indicate when the agreements were executed, while many of those with dates were signed *after* the outside work (unspecified in the agreement) had already appeared on a subsidiary's website or in a subsidiary's newspaper. *Id*. For example, one purported agreement came from Mississippi State University, with an employee of one of Plaintiff's subsidiaries stating, "Thank you for sending in press releases to our newspapers, we are always happy to publish them!" *Id*. at PP000453.

This correspondence lays bare that the "Contributor/Freelance" agreements were manufactured to create the appearance of copyright ownership in order to pursue claims in litigation. Emails from Emmerich's president made this objective clear: "Several national news aggregation companies are using bots to scrape content from the Northside Sun, including the columns of our contributors. The only way to stop them is to copyright our content. We must have a signed agreement from you to do so." *Id*. at PP000417; PP000423-25; PP000431; PP000452. During discovery, Emmerich confirmed that the *only* agreements it had purporting to

convey copyright ownership rights to it were the "Contributor/Freelance" agreements it had produced. *See id*. ¶¶ 44-48, Exs. 38-40. For reasons Defendants explains below, none of these "Contributor/Freelance" agreements established Plaintiff's copyright ownership.

### D. After receiving notice of the ownership deficiencies, Plaintiff crafted an ineffective "Instrument of Conveyance" more than a year after filing its case.

On February 12, 2024, Defendants' counsel sent a letter notifying Plaintiff's counsel that Emmerich lacks valid ownership of any of the copyrights at issue. *Id*. ¶ 49, Ex. 41. The letter explained that, among other issues, the *subsidiaries*—not Emmerich—created and produced the local newspapers, and therefore, any ownership claims in the works belong to the subsidiaries. Four days later, Emmerich responded and provided a document entitled "Instrument of Conveyance, Note and Memorandum of Transfer of All Copyrights from Emmerich Newspapers, Inc. Subsidiaries to the Parent Corporation." *See id*. ¶ 50, Ex. 42 (the "Instrument"). The document was dated *February 15, 2024*, years after Emmerich applied for the copyright registrations at issue, and three days after Defendants notified Emmerich of the invalidity of those registrations. *Id*. Wyatt Emmerich executed it as president of his eponymous company and all its subsidiary corporations. *Id*.

The Instrument states that "***[u]pon the formation of each subsidiary*** [Wyatt Emmerich] intended to, and did, transfer all copyrights and intellectual property rights from the subsidiary to Emmerich Newspapers, Inc." *Id*. (emphasis added). Notwithstanding that the Instrument was created years after Plaintiff applied for the copyright registrations at issue, and months after serving discovery responses that never mentioned any assignments by the subsidiaries to Emmerich, the assertion is obviously pretextual and false: some of the companies that are now subsidiaries were formed well before Plaintiff was incorporated in 1973. FAC. ¶ 21; *see, e.g.*, Newby Decl. ¶ 51, Ex. 43 (subsidiary incorporation data) (Delta Democrat incorporated in 1938; Delta Press

Publishing incorporated in 1942; Commonwealth Publishing incorporated in 1959). And, Plaintiff's president, Wyatt Emmerich, did not become President of Emmerich Newspapers, Inc. until 1990. Newby Decl. ¶ 52, Ex. 44. The Instrument states that "[i]t was always [his] intention that the parent company would have full authority to apply for copyrights and take all necessary steps to protect those copyrights from infringement on behalf of the subsidiary companies." *Id*. ¶ 50, Ex. 42. The Instrument purports to have an "effective date" of "the *incorporation* date of each corporate entity." *Id*. (emphasis added). But the original incorporation date of those companies generally preceded their acquisition by Emmerich and some of them became subsidiaries before Wyatt Emmerich was president of Plaintiff. For example, the Clarksdale Press Register was incorporated in 1949, and was acquired in 1986, which was before Wyatt Emmerich was the president of Plaintiff. *See id*. ¶ 53, Ex. 45 (Deborah Cole, *Clarkdale Press Register Changes with times*, The Clarksdale Press Register (April 1, 2009)). Yet, the Instrument lists 22 of the subsidiaries as "confirm[ing] the transfer of the aforementioned copyright ownership to" Plaintiff. *Id*. ¶ 50, Ex. 42.

## III.    ARGUMENT

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The plaintiff bears the burden of "establish[ing] that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013); *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133-34 (5th Cir. 2009). And the plaintiff must show that it had standing at the time the action was brought. *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (affirming "longstanding principle that 'the jurisdiction of the Court depends upon the state

of things at the time of the action brought'") (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824))).

    **A.**    **Emmerich Newspapers had no standing to bring this lawsuit.**

Under the Copyright Act, only the "legal or beneficial owner of an exclusive right under a copyright" may sue for infringement while owning that right.  *See* 17 U.S.C. § 501(b); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991); *Patterson v. Rawlings,* 287 F. Supp. 3d 632, 638-39 (N.D. Tex. 2018).  "Ownership of a valid copyright is established by proving the originality and copyrightability of the material and compliance with the statutory formalities." *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995).  Copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."  *Id*. § 201(b).  A person or entity that did not create the work, specifically commission the work, or employ the creator of a work can retain ownership rights only through an exclusive license or a valid assignment of exclusive rights.  *See Viral DRM, LLC v. Frank Kent Country, LLC*, No. 3:23-CV-0250-D, 2023 WL 5284844, at *2 (N.D. Tex. Aug. 16, 2023); Melville B. Nimmer & David Nimmer, 3 Nimmer on Copyright § 12.02[A]-[B] (2024).

A certificate of registration creates a *rebuttable* presumption that a copyright is valid and that the registrant owns it.  17 U.S.C. § 410(c).  A defendant may rebut this presumption by offering evidence to disprove the validity of the copyright or by demonstrating that the work at issue is unprotectable.  *Jane Envy, LLC v. Infinite Classic, Inc.,* No. SA:14-CV-065-DAE, 2016 WL 797612, at *4 (W.D. Tex. Feb. 26, 2016); *see also Norma Ribbon & Trimming*, 51 F.3d at 47.  Where evidence "casts doubt on the question, validity will not be assumed."  *Utopia Provider Sys.,*

*Inc. v. Pro–Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1319 (11th Cir. 2010) (internal citations omitted).

Defendants have rebutted these presumptions. Emmerich did not create any of the works or employ the creators of the works it registered. Neither the purported "Contributor/Freelance" agreements nor the after-the-fact Instrument granted Plaintiff ownership over the copyrights—at the time of registration or otherwise. Accordingly, Plaintiff did not hold any valid copyright registrations when it filed this action.[8] Because copyright registration is a prerequisite to filing suit for infringement, Emmerich lacks standing, and its claims must be dismissed. *See Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 308 (2019). Although copyright ownership may overlap with merits issues, courts routinely resolve ownership-based standing defects under Rule 12(b)(1) where, as here, the plaintiff was not the legal or beneficial owner of any exclusive right at the time suit was filed. *See Patterson*, 287 F. Supp. 3d at 637-39. A court may consider evidence outside the pleadings to determine subject-matter jurisdiction, and where standing is absent at filing, dismissal under Rule 12(b)(1) is required. *Id.* at 637-38.

### 1.    Plaintiff lacks standing to sue for works from outside sources.

"[O]riginality is a constitutionally mandated prerequisite for copyright protection." *Feist*, 499 U.S. at 351; *see also id.* at 359-60 (explaining that under the Copyright Act, "originality, not 'sweat of the brow,' is the touchstone of copyright protection in directories and other fact-based works"). "Original" means "that the work was independently created by the author (as opposed

---

[8] The same reasons apply to Plaintiff's claim regarding the integrity of copyright management information under the Digital Millennium Copyright Act, 17 U.S.C. § 1202. Moreover, another court in this district concluded that Plaintiff's URLs are not copyright management information ("CMI"). *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, No. 3:23-cv-391-TSL-RPM, 2025 WL 2146609, at *20 n. 28 (S.D. Miss. July 29, 2025), *motion to certify appeal granted sub nom. Emmerich Newspapers, Inc. v. Particle Media Inc.*, No. 3:23-cv-26-TSL-MTP, 2025 WL 2906046 (S.D. Miss. Sept. 18, 2025) ("Emmerich's URLs are not CMI[.]").

to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.*
at 345. If the claimant on a registration application is not the author, the claimant must include "a
brief statement of how the claimant obtained ownership of the copyright." 17 U.S.C. § 409(5).
Further, a claimant should exclude any copyrightable material it does not own from the application.
Compendium Third §§ 503.5, 621.7;[9] *see id.* § 621.7 ("[M]aterial that is owned by another party
should be disclaimed, regardless of whether that material was created before or simultaneously
with the work that the applicant intends to register."). Similarly, "[i]f the work described in the
application contains an appreciable amount of copyrightable material that has been previously
published, the previously published material should be excluded from the claim." *Id.* § 621.4.

Hundreds of Emmerich's asserted copyright registrations are for works that were authored
by others and that Emmerich falsely claimed as its own original works. These include works such
as funeral-home obituaries, press releases, political advertisements, and wedding announcements
that were clearly authored by other parties. And Emmerich neither identified the true author in its
applications nor included a statement explaining how it obtained rights to these works (because it
did not). Emmerich plainly lacks standing to assert claims over these works. *See Patterson*, 287
F. Supp. 3d at 638-39 (granting motion to dismiss copyright claim when plaintiff lacked ownership
or an exclusive license to the work).

### 2. The "Contributor/Freelance" agreements did not transfer ownership.

The Copyright Act limits a "work made for hire" to two specific situations: (1) "a work
prepared by an employee within the scope of his or her employment"; and (2) "a work specially
ordered or commissioned for use as a contribution to a collective work," among other types of

---

[9] "While the Compendium is intended as a guide to the USCO staff and the public, it has also been
cited and relied upon by Courts deciding copyright cases." *Lieb v. Korangy Publ'g, Inc*., No. CV
15-0040 (AYS), 2022 WL 1124850, at *9 (E.D.N.Y. Apr. 14, 2022) (citing Compendium Third at
2), *appeal dismissed*, No. 22-1084, 2023 WL 3439481 (2d Cir. Mar. 2, 2023).

works.  17 U.S.C. § 101.  For works "specially ordered or commissioned," the parties must agree in a signed, written instrument "that the work shall be considered a work made for hire."  *Id*. Importantly, a work-for-hire agreement must be made with an understanding that, *before or at the time of creation*, a specific work is a work made for hire.  *See Compaq Computer Corp. v. Ergonome Inc.*, 210 F. Supp. 2d 839, 843 (S.D. Tex. 2001) (discussing cases).

The Fifth Circuit has not addressed whether a work-for-hire agreement entered *after* the work is created is valid, and there is a split in authority among circuits on whether such an agreement can confer copyright ownership.  *Looney Ricks Kiss Architects, Inc. v. Bryan*, No. 07-572, 2010 WL 4068885, at *5 (W.D. La. Oct. 14, 2010).  In the Ninth and Seventh Circuits, work-for-hire agreements cannot be made after the fact, nor can they state that all works from a given creator are works "made for hire."  *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412-13 (7th Cir. 1992); *see also Gladwell Gov't Servs., Inc. v. Cnty. of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008) ("The plain language of the statute indicates that a work-for-hire agreement cannot apply to works that are already in existence.").  In contrast, the Second Circuit has held that a written work-for-hire agreement executed after the creation of the works can be valid, but only if it "confirms a prior agreement, either explicit or implicit, made before the creation of the work." *Est. of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74, 77 (2d Cir. 2019).  Moreover, "[w]hen a purported writing does not specify the subject matter and cannot, under any definition, be described as defining the particulars of the deal, it fails to assign a copyright."  *Magicon, LLC v. Weatherford Int'l, Inc.*, No. 4:08-cv-03636, 2009 WL 7868862, at *8 (S.D. Tex. Aug. 14, 2009).

Regardless of which rule is applied, the "Contributor/Freelance" agreements Plaintiff executed with various sources are not valid work-for-hire agreements and therefore do not confer ownership to Plaintiff in the works purportedly covered by the agreements.  The agreements purport to be between Plaintiff ("the commissioning party") and "contributors and freelancers who

submit columns and articles."  Newby Decl. ¶ 18, Ex. 15 ("Contributor/Freelance" agreements).

But the agreements do not create any employment relationship, nor do they "specially order[] or commission[]" any work.  *See* 17 U.S.C. § 101.  Most agreements were made *after* the sources' works appeared in one of the subsidiary's publications and do not include confirmation of any prior agreement made before the creation of the works.  Newby Decl. ¶ 18, Ex. 15.  And even the agreements that were made before the source contributed a work (to Emmerich's subsidiaries) make clear that Emmerich was not commissioning any particular work.  *Id*. (purporting to give Emmerich "the right to publish and copyright all contributed content as a work made for hire"). Rather, as the emails about the "agreements" explain, Emmerich tried to copyright "all" content to try to prevent others from using it, regardless of whether Plaintiff authored or commissioned any specific work.  *See id*.

The agreements were ineffective at giving Plaintiff standing to sue for yet another reason: they conferred only non-exclusive rights to Emmerich; "All contributors and freelancers are given permission to publish their work on any other website, publication or forum that they so choose." *Id*.  And the email Plaintiff circulated when soliciting the agreements stated that signing "does not take away any of your rights to give anyone else permission to use your content.  You are free to use your work anywhere else if you give your permission."  *See e.g.*, *id*., Ex. 15 at PP000412; PP000426; PP000459.  This meant the agreements failed to transfer copyright ownership.  *See R. Ready Prods., Inc. v. Cantrell*, 85 F. Supp. 2d 672, 684 n.11 (S.D. Tex. 2000) ("Holders of a non-exclusive license lack standing to sue, because they have no ownership interest in the copyright."); *see also Eclipse Sportswire v. The Sports Mall, LLC*, No. 8:22-cv-1433-KKM-NHA, 2024 WL 1549643, at *4 (M.D. Fla. Mar. 14, 2024) ("[T]he right to sue for infringement—without the exclusive ownership of the underlying copyright interest attempting to be vindicated—is insufficient to confer standing under the Copyright Act."); *accord Righthaven LLC v. Hoehn*, 716

16

F.3d 1166, 1170 (9th Cir. 2013). In sum, the "Contributor/Freelance" agreements amount to nothing more than an attempt by Plaintiff to manufacture claims for works over which it has no rights. They fail to give Plaintiff standing.

### 3.    Plaintiff lacks standing for works created by its subsidiaries.

"The law is clear that a parent corporation may not assert the legal rights belonging to its subsidiary." *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 204 (W.D.N.Y. 2020) (collecting cases). As applied to copyright registrations, only the subsidiary—*not* the parent—has copyright rights over works the subsidiary creates. *See Disenos Artisticos E Industriales, S.A. v. Costco Wholesale Corp*., 97 F.3d 377, 380 (9th Cir. 1996) ("[A] corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties.").

It is undisputed that the copyrights asserted in this action are for works published by Plaintiff's subsidiaries and created by the subsidiaries' employees (if not by outside sources). Emmerich's subsidiaries, not Emmerich, employed the writers who created the asserted works that did not come from outside sources. *See* Newby Decl. ¶ 5, Ex. 3 (tax returns showing subsidiaries employed writers). The copyrights in those works therefore belonged to the subsidiaries, *not* Emmerich. *See* 17 U.S.C. § 201; *Disenos*, 97 F.3d at 380. And, because the subsidiaries own the copyrights in works by their employees, the employees lacked authority to enter into personal contributor agreements with Emmerich. Emmerich did not own the copyrights when it sought registrations or filed this lawsuit. Nor did it disclose to the Copyright Office that the works were authored by companies or persons other than Plaintiff. Rather, Plaintiff (falsely) listed itself as the author and obtained thousands of registrations on that false basis. *See* Newby Decl. ¶¶ 23-35, Exs. 19-29 (copyright registrations). These copyrights are therefore invalid. Without valid ownership of the copyrights or their registration, Plaintiff lacks standing to bring its claims. *See*

*Big E. Ent., Inc. v. Zomba Enters., Inc*, 453 F. Supp. 2d 788, 797 (S.D.N.Y. 2006) (finding plaintiff lacked standing even though the same person owned plaintiff and company holding copyright), *aff'd*, 259 F. App'x 413 (2d Cir. 2008).

Nor does the purported Instrument infuse legitimacy into these invalid copyrights.  To start, Emmerich created the Instrument a year *after* it had already filed this lawsuit, and therefore, it cannot retroactively create standing.  *See Minden Pictures Inc. v. Ammoland, Inc*., No. 20-2276 (GC) (TJB), 2023 WL 4288332, at *7 (D.N.J. June 30, 2023); *see also Sensory Path Inc. v. Fit & Fun Playscapes LLC*, No. 3:19CV219-GHD-RP, 2022 WL 17073159, at *3 (N.D. Miss. Nov. 17, 2022) ("[A] nunc pro tunc assignment after commencement of a suit cannot retroactively confer standing, and this rule applies even when an assignment is drafted to be effective prior to suit but executed after suit is filed.").  The fact that the Instrument (falsely) declares that it memorializes alleged transfers occurring "[u]pon the formation of each subsidiary" does not change this outcome.  *See Keene Corp.*, 508 U.S. at 207; *Minden Pictures*, 2023 WL 4288332, at *7*.  While the failure to memorialize an assignment until after a suit is filed does not preclude standing, this principle applies only if the oral assignment *in fact occurred* prior to the suit.  *See Triple Tee Golf, Inc. v. Nike, Inc*., No. 4:04-CV-302-A, 2007 WL 4260489, at *23-24 (N.D. Tex. Aug. 10, 2007), *aff'd*, 281 F. App'x 368 (5th Cir. 2008).  Further, with the exception of a work made for hire (where "the employer or other person for whom the work was prepared is considered the author"), even when a copyright is transferred or assigned, the "author" remains the original author as a matter of law, not the transferee.  *See* 17 U.S.C. § 201; *Wood v. B L Bldg. Co.*, No. H-03-713, 2004 WL 5866352, at *5 (S.D. Tex. June 22, 2004).  Plaintiff, however, failed to disclose any other authors in its copyright applications.

In this case, the Instrument is a transparent attempt to try to salvage its invalid copyrights after Defendants notified Emmerich of the fatal defects of ownership and registration.  Emmerich

realized its errors and tried to fix them with a single, flawed document.  It failed.  Beyond its suspicious timing—coming not only after Defendants' letter but also after Emmerich repeatedly confirmed that no other assignments existed—the document itself makes clear that no prior agreement with the subsidiaries occurred.  The Instrument makes the vague and conclusory assertion that Wyatt Emmerich, in his current capacity as the President of Emmerich and each of the subsidiaries, "intended to, and did, transfer all copyrights" and that it was always his "intention that the parent company would have full authority to apply for copyrights and take all necessary steps to protect those copyrights."  Newby Decl. ¶ 50, Ex. 42.  However, the after-the fact assertion of "intentions" by Wyatt Emmerich (allegedly wearing the hat of both the parent and each of the subsidiaries at the time of their acquisition) somehow creating retroactive assignments is insufficient.  *See Minden Pictures*, 2023 WL 4288332, at *2, *7 (rejecting plaintiff's attempt to cure standing by introducing an agreement amendment that "was meant to 'solidify the parties' intent'" and that stated the plaintiff had always possessed the photographer's copyright rights).  Moreover, the Instrument itself states that the consideration of "the value of $1" occurred only at the time of the Instrument's creation, not that any consideration was previously made for the supposed transfer.  Newby Decl. ¶ 50, Ex. 42; *cf. Emerald City Mgmt., LLC v. Kahn*, No. 4:14-cv-358, 2016 WL 98751, at *16 (E.D. Tex. Jan. 8, 2016) (finding later written assignment valid when the plaintiff attached the checks from the earlier assignments).  Further demonstrating that the Instrument is merely a belated and invalid effort (and not a memorialization of any actual earlier agreement) is the effective date of the alleged "transfer"—the "incorporation date" of the companies that are now subsidiaries—decades prior to Emmerich's incorporation in 1973, before the companies became subsidiaries, and in some cases before Wyatt Emmerich became President of Emmerich Newspapers, Inc. in 1990.  Newby Decl. ¶¶ 50-53, Exs. 41-45.  Indeed, Wyatt Emmerich's own conduct before Plaintiff filed this lawsuit shows that he knew the subsidiaries

19

had not already transferred all of their copyrights upon their incorporation or their acquisition by Plaintiff. Starting around 2022, Plaintiff sought "Contributor/Freelance" agreements from dozens of sources—including part- and full-time writers of the subsidiaries. Newby Decl. ¶ 18, Ex. 15. This effort only makes sense if Plaintiff knew at that time that it lacked valid ownership of any copyrights owned by the subsidiaries.

Emmerich's copyright registration histories also expose the fiction of any prior assignment. The instructions on the copyright registration form expressly explain that "[u]nless the work was 'made for hire,' the individual who actually created the work is its 'author.'" Newby Decl. ¶ 54, Ex. 46 (Copyright Office Form TX). The form then provides a section for "Transfer," to explain how a claimant different from the author "obtained ownership of the copyright." *Id*. Plaintiff falsely listed itself as the author, and thus the original owner—a statement that Plaintiff apparently knew was false based on its submissions in this case, where Plaintiff denied that it was the author of the works at issue.[10] And although Plaintiff was not, in fact, the "author," it did not state how it obtained ownership of the copyrights in its thousands of applications. Of course, if a preexisting assignment had occurred, then Plaintiff was required to fill out the applications differently. But it did not. And regardless of the language in the Instrument and the rights it purports to provide Plaintiff, the Instrument cannot rewrite the governing copyright law about who is the author of a work. The Court should reject Plaintiff's after-the-fact attempts to manufacture copyright ownership when none existed.

---

[10] In Defendant/Counter-Plaintiff's Amended Answer, it alleged, "Plaintiff/Counter-Defendant claims to be the author of all the works listed in Exhibit F." Am. Answer [Dkt. 21] ¶ 131. In response, Plaintiff answered, "Emmerich admits that it owns the copyrights to all of the works listed in Exhibit 'F.' ***Otherwise denied***." Answer to Counterclaims [Dkt. 24] ¶ 131 (emphasis added); *see also* Newby Decl. ¶¶ 45-46; Ex. 39 (Pl.'s Resp. Interrog. No. 9) (asserting that "***[t]he authors of each article can be identified on the bylines of each article***" (emphasis added)).

**B.    If the Court does not find that Plaintiff lacks standing, it should refer Plaintiff's defective registrations to the Register of Copyrights.**

If the Court does not conclude at this point that Plaintiff lacks the threshold standing needed to assert its claims, the Court alternatively should refer Plaintiff's registrations to the Copyright Office to advise on whether it would have refused Plaintiff's registrations if it had known of the inaccurate information that Plaintiff knowingly included in its applications at the time of registration.  Defendants do not ask the Court at this stage to adjudicate fraud or intent.  Rather, Congress has mandated a specific procedure when a party alleges that a copyright registration contains knowingly inaccurate information material to registration.  *See* 17 U.S.C. § 411(b).  At this stage, the Court's role is to determine whether such inaccuracies have been alleged, at which point referral to the Register of Copyrights is required.

The Copyright Act requires that when a party alleges that the copyright holder knowingly included inaccurate information on a registration application, "the court *shall* request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(1)-(2) (emphasis added); *see also* United States Copyright Office, Annual Report of the Register of Copyrights: Fiscal Year Ending September 30, 2009, 34 (2009) ("[Congress] amended section 411 . . . by adding subsection (b) to create a new procedure . . . that requires courts to seek the advice of the Copyright Office on issues that my involve fraud on the Copyright Office.").  Defendants need not prove that "(1) the registration application included inaccurate information and (2) the registrant knowingly included the inaccuracy in its submission to the Copyright Office in order for the Court to justify referral to the Copyright Office."  *See Ducky Ltd. v. Iviliia Millionic IT Sp. z o.o.*, No. 3:24-cv-02268-PHK, 2025 WL 1580870, at *2 (N.D. Cal. June 4, 2025).  Rather, "the statute itself makes clear that a court should not and need not require a movant to actually *prove* the two requirements of

§ 411(b)(1) in order to justify the request for a referral of the questions to the Copyright Office—the statute explicitly requires that alleging the inaccuracy is sufficient." *Id*. (citing 17 U.S.C. § 411(b)(2)) (emphasis in original). Instead, "mandatory referral is triggered where 'information described under [§ 411(b)(1)] is alleged'[.]" *Id*. (citing *Olem Shoe Corp. v. Washington Shoe Co.*, No. 09-23494-CIV, 2010 WL 3505100, at *3 (S.D. Fla. Sept. 3, 2010)). For the reasons discussed above, Defendants have sufficiently alleged that Plaintiff knowingly included inaccurate information in all of its registrations.

The Copyright Office will refuse to register a work if, among many other reasons, "[t]he claimant named in the application is not a proper copyright claimant." Compendium Third § 608. The Compendium Third adds, "[t]he Office will not knowingly allow a party that owns less than *all* the exclusive rights in a work to register the copyright in his or her own name, ***because this would create a misleading and inaccurate public record and it would subvert the purpose of the registration system***." *Id*. § 619.1 (emphasis added). Likewise, a registration extends only to new material that the author contributed to that work and does not extend to any unclaimable material, such as previously published material, previously registered material, material in the public domain, and copyrightable material that is owned by a third party. *Id*. § 621.1. The applicant must identify both the new and unclaimable materials and exclude the unclaimable materials from the claim. *Id*. If the applicant's claim in the new material is limited to the uncopyrightable or *de minimis* material, or if there appears to be no other basis for asserting a valid claim in the work, the Copyright Office will refuse registration. *Id*. § 621.9(E-F). As discussed above, each of these circumstances applies here.

Courts have regularly referred cases to the Copyright Office when an applicant, like Emmerich has done, fails to disclose the true creator and does not disclaim non-original works. *See, e.g.*, *Ducky Ltd.*, 2025 WL 1580870, at *2-4; *Neman Bros. & Assocs., Inc. v. Interfocus, Inc.*,

No. 2:20-cv-11181-CAS-JPRx, 2023 WL 115558, at *12 (C.D. Cal. Jan. 4, 2023); *Lieb*, 2022 WL 1124850, at *15-16; *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 1:17-CV-2-DMB-DAS, 2019 WL 3978414, at *5-6 (N.D. Miss. Aug. 22, 2019); *Nason Homes, LLC v. Singletary Constr., LLC*, No. 3:14-cv-1656, 2016 WL 11985340, at *2 (M.D. Tenn. Mar. 23, 2016).  For example, the *Neman Brothers* court referred registrations for Copyright Office review where it was alleged "they do not identify third-party authors of the works contained in those registrations."  2023 WL 115558, at *12.  The Register concluded that the Copyright Office would not have registered the works "had it known the information about the authorship, work for hire status, and derivative work status was inaccurate."  *Id*.  Similarly, the *Ducky* court referred registrations that allegedly included inaccurate information about the applicant's ownership status.  2025 WL 1580870, at *3.  The Register determined that it would have refused registration and made clear that the validity of registration turns on whether the claimant had ownership interests at the time of registration, not later.  *Ducky*, No. 3:24-cv-02268-PHK, Dkt. 47-1 at 9, 12.[11]  Thus, post-registration agreements that purport to transfer ownership are irrelevant to whether registrations should have been granted. *See also Nason Homes*, No. 3:14-cv-1656, Dkt. 106-1 at 2-3 (noting that Register advised it would have refused to register the work if it had known that the application failed to identify the correct claimant)[12]; *Lieb*, No. 15-cv-15-0040-AYS, Dkt. 57-1 at 1 (stating that the Register would have refused registration "if it had known that the article was based on a virtually identical, previously published work[.]").[13]

Emmerich's repeated failures to disclose the inaccuracies in its ownership status justify re-

---

[11]  Available at https://www.copyright.gov/rulings-filings/411/Ducky-Ltd-v-Iviliia-Millionic-IT-411b-Resp-Sept-2-2025.pdf.

[12]  Available at https://www.copyright.gov/rulings-filings/411/nason-homes-llc-v-singletary-construction-llc-no-3-14-cv-1656-md-tenn-june-1-2016.pdf.

[13]  Available at https://www.copyright.gov/rulings-filings/411/lieb-v-korangy-publishing-inv-no-215cv00040.pdf.

review by the Copyright Office here.

## IV.    CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request the Court to

dismiss the case for lack of standing and lack of subject matter jurisdiction under Fed. R. Civ. P.

12(b)(1), and in the alternative, to refer to the Register of Copyrights under 17 U.S.C. § 411(b)

[Dkt. 105], and for such further relief as the Court deems proper.

Respectfully submitted, this 2nd day of February, 2026.

*/s/ Tyler G. Newby*
Dorsey R. Carson, Jr. (MSB #10493)
Kathryn P. Goff (MSB #105678)
Tyler G. Newby (*Admitted Pro Hac Vice*)
Joseph S. Belichick (*Admitted Pro Hac Vice*)
Irene Aguirre *(Admitted Pro Hac Vice)*
Diana Buck (*Admitted Pro Hac Vice*)
Deena J.G. Feit (*Admitted Pro Hac Vice*)

*Attorneys for Defendants*
SMARTNEWS INTERNATIONAL, INC.
SMARTNEWS, INC.
KEN SUZUKI
KAISEI HAMAMOTO

**OF COUNSEL**:
CARSON LAW GROUP, PLLC
125 S. Congress Street, Suite 1336
Jackson, Mississippi 39201
Telephone: (601) 351-9831
Facsimile:  (601) 510-9056
Email: dcarson@thecarsonlawgroup.com
        kgoff@thecarsonlawgroup.com

-and-

FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Email: tnewby@fenwick.com
        jbelichick@fenwick.com
        iaguirre@fenwick.com
        dbuck@fenwick.com
        dfeit@fenwick.com

## <u>CERTIFICATE OF SERVICE</u>

I, Tyler G. Newby, do hereby certify that I have this day filed the above-styled document electronically with the Clerk of Court, which constitutes service by Notice of Electronic Filing upon participants registered in this case with the CM/ECF system, including the following:

Wilson H. Carroll
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi 39180
wilson@wilsoncarroll.com

This the 2nd day of February, 2026.

*/s/ Tyler G. Newby*
Tyler G. Newby
OF COUNSEL